DECISION AND JUDGMENT ENTRY
This case is before the court on appeal from the Lucas County Court of Common Pleas, Juvenile Division, which terminated the parental rights of Ellen B. and, finding Timothy B. not to be the biological father, dismissed Timothy B. from the action. For the reasons that follow, we find that the decision of the trial court should be affirmed.
Justin V. and Alissa V. were born to Ellen B. on February 1, 2000. On February 10, 2000, Timothy appeared before the Lucas County Child Support Enforcement Agency and signed an affidavit acknowledging paternity by swearing that he was the biological father of the children. However, Deborah Wedding, a caseworker from Lucas County Children Services ("LCCS"), testified that on February 15, 2000, at a staffing meeting with nine people in attendance, Timothy stated that he was not the children's biological father. Similarly, Linda Jennings, the children's guardian adlitem, testified that Timothy told her that he was not the biological father of the children. Timothy and Ellen were eventually married in June 2000.
On February 17, 2000, LCCS filed a complaint in dependency and neglect and a motion for shelter care hearing. The complaint alleged that, because of Ellen's drug abuse, history of prostitution, and history of not providing adequate care for her children (she previously lost custody of two other children), and because of Timothy's consumption of alcohol and one DUI conviction, the children should be placed in shelter care. The complaint also sought an adjudication hearing and a finding at that hearing that the children are dependent and neglected, as well as a dispositional hearing and an award of temporary custody to LCCS or to an appropriate relative.
On February 17, 2000, the magistrate held a shelter care hearing and awarded temporary custody to LCCS for shelter care, effective the same day.
On March 23, 2000, Jennings, the guardian ad litem, filed a motion for genetic testing, stating that she had reason to believe that Timothy was not the biological father of the children and that the best interests of the children would be served by determining paternity by scientific testing.In a judgment entry dated March 29, 2000 and filed May 3, 2000, the trial court found the children dependent, awarded temporary custody to LCCS, and denied the guardian ad litem's motion for genetic testing. The judgment entry also stated, "Parents to initiate parentage proceedings at Lucas County Child Support Enforcement to determine if Mr. [B.] is the father of the children."
A case plan was filed on March 24, 2000, and an amended case plan was filed on May 30, 2000. The following areas were to be addressed by the case plan relative to both Ellen and Timothy: "[s]ubstance abuse," "[a]ttachment/bonding-nurturance," and "[p]arenting skills and knowledge." According to the plan, Timothy and Ellen were to undergo assessments for various services and to follow all recommendations. The goal for the children was reunification with the parents. (In an amended case plan filed December 29, 2000, the goal was changed to "adoption.")
On August 23, 2000, Jennings filed a motion to set aside Timothy's acknowledgment of paternity; to join Richard A., putative father; and for genetic testing. In a judgment entry filed November 14, 2000, the magistrate ordered Richard A. joined as a party and ordered genetic testing for Richard, Ellen, and the children. Richard was subsequently excluded as the father and was dismissed from the case.
On December 13, 2000, LCCS moved for permanent custody, to vacate an annual review hearing, and to extend temporary custody. A permanent custody trial was set for May 7 and 8, 2001.
Sometime prior to the trial, Ellen was incarcerated for robbery. Her motion to convey was denied, and she did not appear at trial. However, an attorney was appointed to jointly represent her and Timothy.
On the first day of trial, the trial court denied Jennings' motion to vacate Timothy's acknowledgment of paternity and ordered Timothy to undergo genetic testing to determine if he was the children's biological father. The trial court judge stated that, because genetic testing had not established whether Timothy was the children's biological father, he would proceed with the hearing as if Timothy were the father, but he would not rule on the case until he received the results of the testing. If the testing revealed that Timothy was not the father, he would dismiss Timothy from the case. The trial court inquired as to whether there were any objections to this procedure, and none were made.
LCCS called nine witnesses: James Elliot, a loss prevention officer; Northwood Police Officer Tina Sigler; Toledo Police Detective Keith Dressel; Angela Doe, a counselor at Substance Abuse Services; Glenna V., Ellen's mother; Debra Wedding, a caseworker for LCCS; Yvette Muhammad, a case review facilitator for LCCS; Joyce Ranson, a parent educator for LCCS; and Linda Jennings, the guardian ad litem. Timothy testified on his own behalf and, presumably, on behalf of Ellen.
James Elliot, the loss prevention officer, and Toledo Police Officer Tina Sigler testified about Ellen's arrest for robbery for an incident at Value City involving the theft of a television set.
Detective Keith Dressel testified that Ellen and Timothy were arrested on November 4, 2000 for permitting drug abuse. Detective Dressel testified that the premises where the arrest took place was used for narcotics trafficking, specifically, crack cocaine. He was aware of this fact because he had previously executed two search warrants at that same location for drug trafficking.
On cross-examination, Officer Dressel was asked about some undercover work that Timothy had done for the police. Detective Dressel denied that Timothy would have to use drugs to obtain the trust of the alleged drug dealers, and he also testified that the Toledo Police did not advocate such a practice.
Angela Doe, the substance abuse counselor, testified as an expert as to the drug and alcohol assessments she performed on Timothy and Ellen. Doe first saw Timothy on February 23, 2000. Doe testified that, based on his self-report, she was unable to "substantiate a drug specific diagnosis." However, because of Timothy's criminal and social history, she recommended that he be referred to a mental health agency to rule out any psychiatric problems. When she saw him again on December 29, 2000, Timothy had not followed up on the referral to a mental health agency. In December 2000, Doe's diagnosis remained the same: she was unable to "activate a diagnosis for alcohol and drug services" and she again recommended referral to a mental health agency. However, she had recommended an updated assessment based on one of Timothy's urine specimens testing positive for cocaine. Doe stated that Timothy told her that he had been working undercover in the drug trade, and to protect himself, he had to use cocaine. Nevertheless, because this was not a "pattern" of use, Doe could not recommend drug or alcohol services for Timothy. Doe also testified that, aside from admitting to being incarcerated for the "suspicious deaths" of two individuals whom he says he did not kill, Timothy did not admit to criminal behavior. (Timothy also admitted to "roughing up" a superior while in the military.) Had Timothy admitted to criminal activity, according to Doe, she would have identified "at-risk" behavior and her diagnosis and recommendation would have been different.
As to Ellen, Doe testified that, although Ellen's diagnosis was "dependent," Ellen was, by her self-report, in early to full remission.
Upon questioning by the guardian ad litem, Doe testified that in all instances her assessment of an individual is based on that individual's self-report, and she has no idea whether the individual is being truthful.
Glenna V., Ellen's mother, testified that Justin and Alissa have been placed with her sister and that she (Glenna) helps her sister care for them. She also testified that she had recently spoken with Ellen and Ellen told her that Timothy is not the father of Justin and Alissa and that Timothy is coming between her (Ellen) and her children and family. However, Ellen was not specific with Glenna about what she wanted for the children. Glenna also testified that Ellen has expressed disappointment in herself for becoming involved with drugs and not getting an education, and that she loves her children. Glenna stated that Ellen is working toward her GED in prison and is close to obtaining her diploma. She also testified that Ellen was participating in a prison drug program.
Next, Debra Wedding, the LCCS caseworker testified. She indicated that the agency's goal was to obtain permanent custody of the children and place them for adoption with maternal relatives. As to the services that were offered Ellen and Timothy in an effort to reunify them with their children, Wedding testified that they were offered parenting classes, counseling, and, as mentioned earlier, drug and alcohol assessments. Wedding indicated that both Timothy and Ellen attended parenting classes through LCCS and were then referred to St. Vincent's for further training. According to Wedding, they attended one class together in June 2000 and then did not return until January 2001, at which time only Timothy participated.
Ellen and Timothy were also referred to Unison Behavioral Health Care, where they underwent a diagnostic assessment. During the assessment, counselors believed that Timothy had some anger management issues to work on, and Ellen had some family issues (e.g., conflict and lack of support) to work on. After that assessment, it was recommended that Timothy and Ellen participate in three to five counseling sessions to determine whether they had an ongoing need for counseling services. Neither of them initially followed through with the counseling sessions, but Timothy later attended counseling at Unison for a brief time. However, while Timothy attended counseling, he did not identify any concrete goals, other than to establish a "positive environment" in the event that the children were returned to him. Further, the therapist believed that Timothy had set up a "wall" around himself, making it difficult to "get through" to him and engage in any meaningful therapy.
Wedding testified that in the time she served as the caseworker, Timothy and Ellen had lived in four or five different places. At times, she was able to find the couple, and at times (particularly October and November 2000) it was difficult to get into contact with them. According to Wedding, Timothy and Ellen represented to her that they were not involved in drugs at the time, though she was aware that Timothy had a positive urine screen in the summer of 2000. (Timothy claimed that this was due to his undercover work.) When asked whether her recommendation on the case would have been different had she known that the couple had, for a time, been living in a house with a lot of drug activity occurring inside, Wedding answered that she "would have leaned over" toward LCCS having permanent custody. She testified that, although in the beginning neither claimed to be involved in drugs, toward the end of the case, "that's where they were headed," and the drug situation would be "problematic for the twins." Therefore, her recommendation at the time of trial was that LCCS have permanent custody. She gave as reasons for this decision that Ellen had other children she did not have custody of and that she did not avail herself of the services offered. As for Timothy, Wedding testified that Timothy was not honest about his criminal activity, he denied his involvement in the robbery incident involving Ellen, and his lifestyle was not beneficial to the children.
On cross-examination, Wedding indicated that Timothy was participating in parenting classes at St. Vincent's and that he was originally enrolled in a course that required the children's attendance with the parents. Because of complications with transportation, it was not always possible for the children to be at the classes; therefore, Timothy changed enrollment to a course that did not require the children's presence. Wedding was asked about an administrative review dated June 2000. She admitted that, at that time, the review indicated that Timothy and Ellen had attended seven parenting sessions at LCCS, that they were doing well with the twins, that their participation in the classes was very good, and that their attendance was excellent.
Upon questioning from the guardian ad litem, Wedding testified that she was aware of criminal charges pending against Timothy in Wood county for forgery and in Toledo for carrying a concealed weapon and for drug-related charges. She stated that Timothy and Ellen intended to remain together.
On redirect examination, Wedding testified that at the June 2000 administrative review, it was reported that Timothy and Ellen were doing well in LCCS parenting classes, but in the end, LCCS's parent educator indicated that Timothy and Ellen did not pass LCCS's parenting education program. During the parenting classes, Timothy was given a test known as C.A.P.I., and his scores were of concern to the parent educator. Ellen did not take the C.A.P.I. test.
Wedding also testified on redirect that the couple told her at some point in the case plan that they were not going to participate in services. In fact, there was a gap in the parenting classes from July or August of 2000 until January 2001, when Timothy began taking classes again at St. Vincent's. Wedding also testified that during the same period of time (July or August 2000 to January 2001), the couple stopped visiting with the children regularly.
Next, Yvette Muhammad, a case review facilitator for LCCS, testified. According to Muhammad, Timothy had admitted at a staffing that he was not the children's biological father, but he signed the affidavit acknowledging paternity because he collects social security disability benefits and would always be able to secure some type of income for the children. She also testified about the several relatives that, in turn, cared for the twins.
Joyce Ranson, a parent educator for LCCS, also testified. According to Ranson, she had contact with Timothy and Ellen from March 2000 until the end of July 2000. After July 2000, Timothy and Ellen had completed the parenting program and she was no longer able to reach them. She also testified as to the couple's failure to follow through with the St. Vincent's parenting classes following the conclusion of the LCCS classes. Therefore, Ranson closed her file during the summer of 2000. Ranson also explained more about the expectations of the LCCS parenting classes. She testified that, in addition to attending the sessions, the couple were required to make themselves available with the twins for weekly visits from Ranson. Initially, Ranson met the couple at Timothy's mother's home, where the twins were staying. She testified that on several occasions either Timothy, Ellen, or both were unavailable. She explained that on one visit, which occurred at approximately one o'clock in the afternoon, Timothy's mother was watching one of the children while Ellen was sleeping in bed with the other. Timothy's mother went to get Ellen and told Ellen that she should not be sleeping with the baby in bed with her, and Ellen responded that she had pillows around the baby. She then became upset that Ranson was there to visit, and she "stormed" back into the bedroom and refused to talk further with Ranson.
Ranson then testified that when she closed her file in July 2000, Timothy and Ellen had not successfully completed the parent education program because, among other things, there was not, as she said, an "increase in knowledge" for either Timothy or Ellen. Additionally, they had not followed up with parenting at St. Vincent's. She then testified as to Timothy's and Ellen's strengths and weaknesses. As for Ellen, her strengths were a genuine concern for the children, at least initially, and she had empathy for them. Another strength was communicating to the children in a positive way. However, one of Ellen's weaknesses was problem-solving, and she also had problems recognizing and managing her feelings. In addition, Ellen did not have a positive social network. In terms of Timothy's strengths, he was a good problem-solver and showed empathy. However, he, too, had trouble recognizing and managing his emotions and did not have a positive social network.
When asked why she believed that recognizing and managing feelings was a weakness for Timothy, Ranson testified that she administered a C.A.P.I. test to Timothy, and Timothy scored high for potential child abuse. The test revealed that he had a problem with loneliness, a problem with feeling comfortable with people around him and not having a positive social network, and he had problems putting his feelings into words and not acting out when angry. She recommended anger management classes for him. Quantitatively, Timothy scored two hundred eight on the test; any score over one hundred sixty-six would indicate a high potential for child abuse if services are not offered.
On cross-examination, Ranson admitted that she had been on a visit with Timothy and the twins and saw appropriate communication between them. She also testified that, while his score on the C.A.P.I. at the beginning of the program was two hundred eight, by the end of the program it was one hundred sixty-six.
On redirect examination, Ranson discussed the drop in Timothy's C.A.P.I. score from two hundred eight to one hundred sixty-six. She indicated that, despite the drop in the C.A.P.I. score, she was still recommending anger management for Timothy because he was "faking good" on the second test. According to Ranson, some sort of control inherent in the test indicates whether an individual taking the test is "faking good" or "faking bad." On re-cross examination, Ranson indicated that on the first test, this same control indicated that Timothy was accurate; in other words, the score was not a result of "faking good" or "faking bad."
Next, the guardian ad litem testified to the fact that, after Timothy had signed the affidavit acknowledging paternity, he stated to her that he was not the father of the children.
Timothy testified on his own behalf. Timothy stated that he was living between his mother's house and his step-father's house because he was on a waiting list for a three-bedroom townhouse. He testified that he always informed LCCS of his various addresses. He also testified that he signed the affidavit acknowledging paternity because he was not sure if he was the children's father or if the children's father was the man who was also the father of Ellen's second child. However, after the twins were born and he discovered that they were biracial, he assumed that he was the father. (Timothy is African-American and Ellen is Caucasian.)
According to Timothy, he was not involved in the robbery for which Ellen was arrested, and he came on the scene just in time to see Ellen struggling with an individual later identified as a security guard. He also indicated that his positive urine screen was because he was working undercover for the Toledo Police and, to appear legitimate to the suspected drug dealers, he snorted cocaine. He admitted that nobody in the police division advised him to use cocaine in the course of his undercover work, but if he had not proven himself trustworthy to the suspects, he would have become a "casualty."
In terms of the case plan, Timothy testified that he underwent the alcohol assessment as recommended, and he denied the statement in the case plan that read: "Tim admits to drinking beer on a regular basis." According to Timothy, he had not consumed beer for three or four months, but when he had been consuming beer, it was only one or two cans on a weekend or holiday. He testified that he completed the parenting classes at LCCS and then went to only one class at St. Vincent's, but he testified that he was not required to attend any other classes at St. Vincent's. He discussed his most recent set of parenting classes at Harbor Behavioral Health Care, stating that he switched to Harbor because that course did not require the attendance of children; he believed the Harbor classes were better suited to him because he was having trouble getting the children transported to the classes at St. Vincent's. He admitted that he did not inform LCCS that he was making this change to Harbor. Nevertheless, Timothy stated that he re-joined the St. Vincent's classes in January 2001. He also indicated that he finished counseling at Unison Behavioral.
As to visitation with the twins, Timothy testified that he never intentionally skipped visitation, but he had missed visitation when he was incarcerated or when he had forgotten. He indicated his intent to support Ellen if she was "positive," but if not, he would have to do what is best for the twins. In terms of his hopes for the twins, Timothy testified that he wanted the twins to live with him because he could "get [himself] together." He did not want them to be adopted because he had put forth significant effort on behalf of Ellen and the children.
On cross-examination, when asked whether he had ever considered leaving his wife so that he could "present [himself] as a viable alternative parent" for the twins, Timothy indicated that he had not considered that. He admitted that Ellen had problems with drugs at various times during their relationship, and he indicated that he thought she had such problems in the last six months of 2000. He denied that they ever lived in a crack house. He admitted an arrest in the latter part of 2000, but he claimed that it was a case of mistaken identity, and what police thought was a crack pipe was actually just silverware wrapped in aluminum foil. He also denied the statement in the police report for Ellen's robbery that he refused to cooperate with the police. As to the forgery charge in Wood county, he states that the charge is based on some erroneous information about a check that he received for working that the police claim was stolen. He admitted to being convicted on check charges in Sylvania in 1993, and claimed he was making restitution on them. He also admitted to a conviction for check charges in Oregon, Ohio. He denied having a problem with alcohol or drugs, and he likewise denied a problem with anger management, although he admitted that he had a problem with stress.
Timothy admitted not visiting with his children for three or four months, saying that it took several months "to even try to be able to see [his] kids." During that time, he stated that he was "making the arrangements" to provide for the children's care, and any time a caregiver asked him to provide something, he did. He explained that he had accounts set up for the children into which he was putting their social security payments. Apparently, even though the children were not residing with Timothy, he continued to get social security payments for them. However, at some point, LCCS contacted social security and had the payments sent to the children's caregiver instead of to Timothy.
Next, the guardian ad litem questioned Timothy. She asked him specific questions about the robbery incident involving Ellen, and Timothy denied certain facts in the police report (relating to Timothy's lack of cooperation). With regard to counseling at Unison, Timothy indicated that he did not identify goals for that treatment because he thought that was up to the counselor. He stated that, while in counseling at Unison, he denied having problems with anger except for a period while he was in the military. He admitted that he did not tell the counselor at Unison that Joyce Ranson had recommended that Timothy work on anger management, saying that he "took it for granted" that such a fact would be in the paperwork. On redirect examination, Timothy denied using the children's social security money for his personal gain.
Finally, the guardian ad litem gave her recommendation that the best interest of the children would be served if LCCS had permanent custody of the children.
Subsequent to the trial, genetic testing revealed that Timothy was not the biological father of the twins. He was advised of this fact through his attorney, and he indicated through counsel that he did not desire a second opinion through further testing. Accordingly, Timothy being excluded as the father, the court, as it indicated it would, dismissed him as a party to the lawsuit in a judgment entry filed July 19, 2001. The court then made findings relative to Ellen. The court found that, despite reasonable case planning and diligent efforts by LCCS to assist the parents to remedy the problems causing the removal of the children from the home, the parents have failed continuously and repeatedly to substantially remedy the situation, adding "Ms. [V. B.] has not utilized services consistently and effectively."
The court also found that the parents demonstrated a lack of commitment to the children by failing to regularly visit or communicate with them, or "by other actions showing an unwillingness to provide an adequate permanent home for the children," adding, "Ms. [V. B.] has been involved in a lifestyle that is not conducive to child rearing, in that she has been frequenting drug houses and engaging in criminal activity." Also significant to the court in reaching its decision was the fact that Ellen was incarcerated and would not be available to care for the children for at least eighteen months following the motion for permanent custody or the dispositional hearing. The court noted that Ellen had pleaded guilty to robbery and had been sentenced on March 12, 2001 to two years incarceration, with thirty days credit for time served. The court also found that permanent custody to LCCS was in the best interests of the children, that LCCS had made reasonable efforts in the form of casework services, and that LCCS made reasonable efforts to finalize a permanency plan for the children by attempting, initially, to work towards reunification and then towards adoption. The court then terminated all parental rights.
Subsequently, Timothy, acting pro se, filed a form labeled "Objection to Magistrate's Decision," challenging his exclusion from the case after he had signed an affidavit acknowledging paternity. The trial court considered this document a motion for reconsideration and denied it.
Ellen and Timothy now appeal, setting forth the following three assignments of error:
"ASSIGNMENTS OF ERROR
 "I. THE TRIAL COURT ABUSED ITS DISCRETION, COMMITTED REVERSIBLE ERROR AND RULED AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN IT DISMISSED APPELLANT TIMOTHY [B.] AS A PARTY.
 "II. THE TRIAL COURT ERRED AS A MATTER OF LAW AND RULED AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN IT TERMINATED THE PARENTAL RIGHTS OF THE APPELLANTS ON THE GROUNDS OF R.C. 2151.414(E)(1).
 "III. THE TRIAL COURT ERRED IN AWARDING PERMANENT CUSTODY TO APPELLEE WHEN APPELLANTS WERE NOT AFFORDED EFFECTIVE ASSISTANCE OF COUNSEL."
In their first assignment of error, Timothy and Ellen contend that the trial court erred when it dismissed Timothy from the lawsuit. They claim: (1) that the acknowledgment of paternity signed by Timothy was final and any challenge to that acknowledgment was barred on the basis ofres judicata; and (2) res judicata barred the trial court from ordering genetic testing when a previous motion for genetic testing was denied. However, at the trial, the trial court judge indicated on the record that he intended to dismiss Timothy as a party if the results of the genetic testing showed that Timothy was not the biological father. Specifically, the trial court stated:
 "Now, our thought was knowing that we couldn't have the test done before the trial, Mr. Mondville [Timothy and Ellen's attorney], my thought was let's have the trial as if your client is the father, however, I won't announce a decision. I'll take it under advisement. If the genetic test clears him and says he's not the father, then he's excused as a party and I don't have to make a ruling as to him. If, on the other hand, the genetic test does not exclude him, then I'll make a decision including him in my decision. Do you see what I mean?
"MR. MONDVILLE: I do, Your Honor.
 "THE COURT: Do you have any objections to that procedure? And if you do, voice it."
Mondville questioned whether it might be more judicially economical to wait until the results of the genetic testing came back before proceeding, but he did not object to the trial court's indication that Timothy would be dismissed if testing proved him not to be the father. The trial was then held with the understanding that Timothy would be dismissed if he was not the father. At the conclusion of the trial, the trial court again stated the procedure he would be using and invited objection:
 "Okay. As agreed to yesterday we have the genetic testing pending, and I think we agreed yesterday — and correct me if I misstate anything — that I would take the matter under advisement to await the outcome of the genetic testing. If the genetic test were to exclude him, then we dismiss him and he has no legal rights and that ends it all not by my finding in favor of the Board but because he wouldn't be a party anymore." (Emphasis ours.)
Neither Timothy nor his attorney indicated that they had not agreed with such a procedure or that they objected. Moreover, the trial court addressed Timothy personally and again informed him that he would be dismissed if genetic testing indicated he was not the father, and Timothy did not object. The court specifically stated, "If the genetic test excludes you as the father, then you're out automatically because you areno longer the father. Do you understand that?" Timothy answered, "Yes." (Emphasis ours.) For all of these reasons we find that Timothy waived the argument that he should not have been dismissed as a party.
Moreover, this issue is not reviewable under the plain error standard of review. "Plain error" is defined as error that is "obvious and prejudicial although neither objected to nor affirmatively waived * * *."Schade v. Carnegie Body Co. (1982), 70 Ohio St.2d 207, 209. Since Timothy affirmatively waived this alleged error, we find the first assignment of error not well-taken.[1]
In their next assignment of error, Timothy and Ellen contend that the trial court's decision terminating their parental rights was against the manifest weight of the evidence. Since the trial court dismissed Timothy from the lawsuit and did not make a decision on the merits relative to Timothy, we will address this assignment of error as to Ellen only.
The trial court made findings under R.C. 2151.414 (E)(1), (4), and (12). Those sections provide:
 "(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
"* * *.
 "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
"* * *.
 "(12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing."
The Supreme Court of Ohio has held that clear and convincing evidence is:
 "* * * that measure or degree of proof which is more than a mere `preponderance of the evidence,' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
We cannot agree that the trial court's findings as to Ellen were not supported by clear and convincing evidence. She did not follow through with the LCCS parenting education program or the counseling sessions as recommended by the case plan, and she continued to engage in criminal behavior and associate with those in the drug culture. See R.C.2151.414(E)(1). She also stopped visiting regularly with the children for several months. See R.C. 2151.414(E)(4). Further, Ellen was incarcerated in March 2001 and will remain incarcerated until sometime in early 2003, and thus will be unable to care for the children for eighteen months following filing of the motion for permanent custody or the dispositional hearing. See R.C. 2151.414(E)(12). Since the trial court's findings under R.C. 2151.414(E) were supported by clear and convincing evidence, the second assignment of error is not well-taken.
In their third assignment of error, Timothy and Ellen contend that they did not receive effective assistance of counsel. The Supreme Court of Ohio has held that courts should apply a two-part test to determine ineffective assistance claims. According to the Supreme Court:
 "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." State v. Bradley (1989), 42 Ohio St.3d 136, at paragraph two of the syllabus, certiorari denied (1990), 497 U.S. 1011, citing State v. Lytle (1976), 48 Ohio St.2d 391; Strickland v. Washington (1984), 466 U.S. 668.
The court must defer to the strong presumption that counsel's performance falls within the wide range of reasonable professional performance.Bradley, 42 Ohio St.3d at 142. Even if counsel's performance falls outside the objective standard of reasonable representation, the court shall not reverse unless counsel's ineffectiveness resulted in prejudice. Id. In order to show prejudice warranting reversal, the defendant must show that there is a reasonable probability that, but for counsel's ineffectiveness, the outcome of the proceeding would have been different. Id., quoting Strickland, 466 U.S. at 694.
The Court in Bradley derived guidance from the Strickland decision on how to proceed with the two-part analysis for ineffective assistance claims. In Strickland, the United States Supreme Court stated:
 "Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697, quoted in Bradley, 42 Ohio St.3d at 143.
We shall discuss Timothy's claims first. Timothy contends that counsel was ineffective in: (1) not discussing matters related to the case or answering questions prior to the permanent custody trial; (2) refusing to call witnesses at trial that Timothy made available; (3) failing to object on foundational grounds to Ranson's testimony about the C.A.P.I. test scores; (4) failing to object to speculative questions asked of Glenna V. about Ellen's state of mind; (5) failing to object to Glenna's hearsay testimony; (6) failing to object to questions posed to Timothy that called for hearsay and speculation and that was privileged; and (7) agreeing to Timothy's dismissal if he was found not to be the biological father of the children.
Given our holding on the first assignment of error, it is unnecessary for us to address any of these contentions except for the last. The first six allegations do not rise to the level of ineffective assistance of counsel because there is not a reasonable probability that the outcome of the trial would have been different. Because Timothy agreed to dismissal if he was found not to be the biological father, the only thing that would have changed the outcome of the trial would have been different results on the genetic testing.
The last contention, that counsel was ineffective in agreeing to dismissal, could have had, under a different record, an impact on the outcome of the case. However, a review of the record in this case does not reveal a reasonable probability that, but for counsel's ineffectiveness, Timothy would have prevailed at trial. The testimony at trial revealed that Timothy had engaged in criminal behavior (he had several criminal convictions and several charges pending), had been involved in the drug culture, had not followed through consistently with the case plan, did not have stable housing, and had gaps in his visitation with the children. Given the state of the record, we cannot say that counsel's alleged ineffectiveness prejudiced Timothy. For theses reasons, we find the third assignment of error not well-taken as it relates to Timothy.
Ellen also claims that she had ineffective assistance of counsel. Generally, Ellen claims that joint representation with Timothy was inappropriate because they had divergent interests. She claims that she was virtually ignored as a party at the trial and that counsel was ineffective in failing to object to questions calling for information protected by marital privilege or to instruct Timothy to invoke marital privilege when questioned about Ellen's criminal behavior. She also claims that counsel seemed to encourage Timothy to testify that Ellen was the sole cause of the children's removal from her.
First, we agree with LCCS that, since Ellen was incarcerated, reasonable trial strategy would have been to concentrate counsel's efforts at trial on portraying Timothy in the best light so as to regain custody for Timothy and, when she was released, for Ellen. Moreover, given the overwhelming evidence militating against Ellen having permanent custody, and given that Ellen could have had her parental rights terminated based solely upon her incarceration, we cannot say with reasonable probability that the instances of alleged ineffectiveness she complains of would have affected the outcome of the trial. Therefore, we find the third assignment of error not well-taken as it relates to Ellen.
Upon consideration whereof, we find that substantial justice has been done the parties complaining, and the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellants are ordered to pay the court costs of this appeal.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
James R. Sherck, J., Mark L. Pietrykowski, P.J., JUDGES CONCUR.
[1] Timothy's pro se "objection" after the trial court's order, which the trial court considered as a motion for reconsideration, is a nullity; the civil rules do not allow for a motion for reconsideration following a final order in the trial court. Pitts v. Ohio Dept. ofTransp. (1981), 67 Ohio St.2d 378, paragraph one of the syllabus.